ROBERT W. HIRSH, SBN 102731
ROBERT W. HIRSH & ASSOCIATES
8383 Wilshire Boulevard, Suite 510
Beverly Hills, California 90211
Telephone: 310-275-7800; Facsimile: 310-275-4050
Email: rhirsh@hirshlaw.com

CHARLES L. POST, SBN 160443
WEINTRAUB, GENSHLEA CHEDIAK
A LAW CORPORATION
400 Capitol Mall, 11th Floor
Sacramento, California 95824
Telephone: 916-558-6000; Facsimile: 996-446-1611
Email: cpost@weintraub.com

**Attorneys for Plaintiffs Carmelo Anthony,
Melo Enterprises, Inc., and
Chosen One Properties, LLC**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CARMELO ANTHONY; MELO ENTERPRISES, INC.; and CHOSEN ONE PROPERTIES, LLC,**<br><br>    Plaintiffs,<br><br>    v.<br><br>**LARRY HARMON aka LARRY W. HARMON aka LAWRENCE HARMON; LARRY HARMON & ASSOCIATES, P.A.; HARMON-CASTILLO, LLP; FRANK CASTILLO; KELLY RUNKLE; SORA BARNES; KENNY CRUZ aka KENNETH CRUZ; KC DEVELOPMENT, LLC; VITALIS PARTNERS, LLC; PROFESSIONAL PARTNERS, LLC; and MCG PARTNERS**<br><br>    **Defendants.** | CASE NO. 2:09-CV-02272-WBS-KJM<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>1. **BREACH OF FIDUCIARY DUTY**<br>2. **NEGLIGENCE**<br>3. **NEGLIGENCE** *PER SE*<br>4. **CONVERSION**<br>5. **FOR AN ACCOUNTING**<br>6. **B&P 17200,** *et. seq.*<br>7. **RESTITUTION/ UNJUST ENRICHMENT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Carmelo Anthony ("Anthony"), Melo Enterprises, Inc. ("MEI"), and Chosen One Properties, LLC ("COP") (collectively "Plaintiffs") allege:

## I.

## JURISDICTION AND VENUE

1. This Court has jurisdiction of this action pursuant to 28 U.S.C. Section 1332(a)(b). There is complete diversity between all of the Plaintiffs on the one hand, and all defendants on the other. There is more than $75,000.00 in controversy.

2. Venue lies in this district pursuant to 28 U.S.C. Section 1391(a).

## II.

## THE PARTIES AND THEIR ROLES

3. Anthony is and at all relevant times was an individual and a citizen of Colorado.

4. MEI is and at all relevant times was a duly formed Delaware corporation with its principal place of business located in Colorado, and exclusively owned by Anthony.

5. COP is and at all relevant times was a duly formed Delaware limited liability company with its principal place of business located in Colorado, and exclusively owned by Anthony.

6. Defendant Larry Harmon aka Larry W. Harmon aka Lawrence Harmon ("LH") is and at all relevant times was an individual residing and doing business in the Eastern District of California. At all relevant times, LH was a Certified Public Accountant ("CPA" and/or "Licensee") licensed to do business in the State of California by the State Board of Accountancy ("the Board"), and a fiduciary of Plaintiffs in his capacity as their business manager, financial advisor, trustee, and CPA.

7. Defendant Frank Castillo ("Castillo") is and at all relevant times was an individual residing and doing business in the Eastern District of California. At all relevant times, Castillo was a CPA licensed by the Board, and a fiduciary of Plaintiffs in his capacity as their business manager, financial advisor, trustee, and CPA.

8. Defendant Larry Harmon & Associates, P.A. ("LH Corp") is and at all relevant times was a duly formed California corporation with its principal place of business located in the Eastern District of California. At all relevant times, LH Corp was in the business of providing

**2**
FIRST AMENDED COMPLAINT

fiduciary services to clients including business management, trustee, and public accountancy services. At all relevant times, LH and Castillo controlled and managed LH Corp . At all relevant times, both LH and Castillo actively controlled and managed all of LH Corp's involvement in Plaintiffs' business affairs. At all relevant times, LH owned LH Corp. Upon information and belief, Castillo obtained an ownership interest in LH Corp in or about 2008.

9. Upon information and belief, at all relevant times, defendant Harmon-Castillo LLP ("Harmon LLP") is and at all relevant times was a duly formed limited liability partnership formed between LH and Castillo, and at all relevant times, its principal place of business has been in the Eastern District of California. At all relevant times, both LH and Castillo owned, controlled and managed Harmon LLP, and both LH and Castillo actively controlled and managed all of Harmon LLP's involvement in Plaintiffs' business affairs.  At all relevant times, Harmon LLP was in the business of providing fiduciary services to clients, including business management, trustee, and public accountancy services.

10. LH, Castillo, LH Corp, and Harmon LLP may collectively be referred to as "the Harmon Defendants".

11. The duties and standard of care governing California CPAs rendering public accountancy services to their clients include:

    a. the California Accountancy Act, i.e. B & P Code Sections 5000-5158;

    b.  Title 16 Code of California Regulations ("CCR") Division 1, which are promulgated by the Board; and,

    c. various regulations and rules promulgated by the American Institute of Certified Public Accountants ("AICPA") and adopted by the Board pursuant to 16 CCR Section 58, including:

        1. the AICPA Statement On Responsibilities In Personal Financial Planning Practice;

        2. the AICPA Accountants Code of Professional Conduct; and,

        3.  the AICPA Standards on Consulting Services, standards. (collectively "AICPA Standards").

12. In addition to the duties and standards of care pled in the preceding paragraph, general California law also sets forth the duties and standard of care owed by business managers, trustees, and fiduciaries to their clients.

13. Upon information and belief, defendant Vitalis Partners, LLC ("Vitalis") is and at all relevant times was a duly formed California limited liability company with its principal place of business located in the Eastern District of California. At all relevant times, the Harmon Defendants owned, controlled and managed Vitalis's business affairs. Upon information and belief, Vitalis is an entity involved in the development of real estate in Redding, California.

14. At all relevant times, the Harmon Defendants had a pecuniary interest in Vitalis, including a membership interest.

15. Each defendant was the agent, employee, and employer of each of its co-defendants, and in doing the acts hereinafter mentioned, each defendant was acting within the scope of its authority and as such agent and employee with the permission and consent of its co-defendants, and each of them.

### III.
### THE FORMATION AND TERMINATION OF THE RELATIONSHIPS BETWEEN PLAINTIFFS AND THE HARMON DEFENDANTS

16. In or about 2003, after leading Syracuse University to its first NCAA championship, Anthony, at 19 years old, turned pro and signed with the Denver Nuggets of the NBA.

17. At all relevant times, Anthony had no experience or training in business, and required the services of a business management and public accountancy firm to, among other things, act as the business manager, trustee, financial advisor, public accountant, and fiduciary for himself and his present and future companies.

18. In 2003, Anthony was referred to LH and his accounting firm, LH Corp.

19. In 2003, LH on behalf of the Harmon Defendants, represented to Anthony that the Harmon Defendants were licensed, competent, and experienced CPAs and business managers, and they were willing to act as the business managers, CPAs, financial advisors, and trustees for Anthony and his present and future companies in a fiduciary capacity, including safeguarding

**4**
FIRST AMENDED COMPLAINT

Plaintiffs' monies.

20. In 2003, Anthony retained LH and LH Corp to be the business managers, trustees, financial advisors, CPAs, and fiduciaries for himself and his present and future companies. These duties included, but were not limited to:

 a. providing Plaintiffs with public accountancy services pursuant to B & P Code Section 5051(a-i) including bookkeeping, financial, investment planning, tax, and management services; and,

 b. safeguarding as trustees Plaintiffs' monies which Plaintiffs entrusted to them; paying Plaintiffs' bills as they became due with Plaintiffs' permission; providing Plaintiffs with sound business and investment advice; and, adequately and clearly informing Anthony of all important financial matters concerning the Plaintiffs;

21. From 2003 through late 2008, the Harmon Defendants were Plaintiffs' business managers, trustees, financial advisors, financial planners, CPAs, and fiduciaries, whose duties included, but were not limited to:

 a. providing Plaintiffs with public accountancy services pursuant to B & P Code Section 5051(a-i) including competent bookkeeping, financial planning, investment planning, tax, and management services; and,

 b. safeguarding as trustees Plaintiffs' monies which Plaintiffs entrusted to them; paying Plaintiffs' bills as they became due with Plaintiffs' permission; providing Plaintiffs with sound business and investment advice; and, adequately and clearly informing Anthony of all important financial matters concerning the Plaintiffs.

22. At all relevant times, Plaintiffs, who were the recipient of public accountancy services from the Harmon Defendants, were clients of the Harmon Defendants pursuant to B & P Code Section 5035.2.

23. From 2003 through late 2008, Plaintiffs, who were not experienced in business, relied exclusively upon the Harmon Defendants to, among other things, perform the duties alleged in paragraph 21, herein.

24. From 2003 through late 2008, Plaintiffs, among other things, entrusted the Harmon

Defendants with vast sums of monies.

25. At all relevant times, the Harmon Defendants knew that Anthony, on behalf of himself and the remaining plaintiffs, exclusively relied upon the Harmon Defendants to, among other things, perform the duties alleged in paragraph 21, herein.

26. Plaintiffs' terminated the Harmon Defendants' services in late 2008.

## IV.

## THE WRONGFUL CONDUCT

**A.     The Harmon Defendants Failed to Have A Retainer/Engagement Agreement.**

27. At all relevant times, the Harmon Defendants provided "personal financial planning" public accountancy services to the Plaintiffs pursuant to the AICPA's Statements On Responsibilities In Personal Financial Planning Practice, Sections 100.01-03 and .05.

28. AICPA Statements On Responsibilities In Personal Financial Planning Practice, Sections 100.01-13 and .17 require that CPAs providing personal financial planning services document the scope and nature of the services being provided.

29. In the alternative, aside from the AICPA standards, it is the custom and practice, and the required standard of care for non-Licensee business managers providing personal financial planning services to document the scope and nature of the services being provided, especially when vast sums of monies are entrusted to them by a client.

30. The Harmon Defendants never presented Plaintiffs with a retainer/engagement agreement or any other document at any time which governed or described the personal financial planning services being provided, and never documented the scope and nature of the services being provided to the Plaintiffs.

31. The failure of the Harmon Defendants to document the scope and nature of the personal financial planning services being provided to Plaintiffs violates the AICPA's Statements On Responsibilities In Personal Financial Planning Practice including Sections 100.01-13 and 100.17

32. In the alternative, the failure of the Harmon Defendants to document the scope and nature of the personal financial planning services being provided to the Plaintiffs falls below the

standard of care required of business managers who are not Licensees.

**B.   The Harmon Defendants Refused To Provide An Accounting.**

33. After Plaintiffs' terminated the Harmon Defendants' services:

   a. in late 2008, Plaintiffs demanded from the Harmon Defendants that they immediately furnish Plaintiffs' new business manager with all books and records relating to Plaintiffs, among other things; and,

   b. on February 23, 2009, Plaintiffs, via their attorney demanded that the Harmon Defendants furnish Plaintiffs with all books and records relating to Plaintiffs, Vitalis, and former defendant Professional Partners, LLC ("PP") among other things.

34. At all relevant times, the Harmon Defendants had a pecuniary interest in PP, including a membership interest.

35. Based upon Plaintiffs' demands, the Harmon Defendants were required to furnish Plaintiffs with the Harmon Defendants' complete, true, and correct books and records relating to all public accountancy services which they rendered to Plaintiffs pursuant to B & P Code Section 5037(b) and 16 CCR Sections 58 and 68, and all financial records of any type relating to Plaintiffs, including but not limited to Plaintiffs' involvement, if any, with Vitalis and PP.

36. In the alternative, based upon Plaintiffs' demands, the Harmon Defendants, as Plaintiffs' fiduciaries, and as a matter of general California law, were required to furnish Plaintiffs with the Harmon Defendants' complete, true, and correct books and records relating to all financial matters of any type relating to Plaintiffs, including but not limited to Plaintiffs' involvement, if any, with Vitalis, PP, and former defendant, MCG Architects ("MCG").

37. The Harmon Defendants refused and failed to furnish Plaintiffs' complete, true, and correct books and records as demanded by Plaintiffs and their attorney, including those related to Vitalis, PP, and MCG.

38. Instead, the Harmon Defendants furnished incomplete books and records to Plaintiffs' new business manager, which among other things, failed to adequately disclose and explain, as alleged below, the transfer of $1,600,000.00 of monies belonging to Plaintiffs to Vitalis ("the Vitalis Transfers") and other monetary transfers, including those to PP and MCG.

39. By failing to provide Plaintiffs with their complete books and records relating to Plaintiffs, Vitalis, PP, and MCG, Plaintiffs failed to comply with B & P Code Section 5037(b) and 16 CCR Sections 58 and 68.

40. In the alternative, by failing to provide Plaintiffs with complete books and records relating to Plaintiffs, Vitalis, and PP, Plaintiffs breached other duties owed to Plaintiffs under California law.

**C.     The Harmon Defendants Wrongfully Made The Vitalis Transfers.**

41. From on or about June 2, 2008 through on or about October 21, 2008, the Harmon Defendants, without Plaintiffs' permission, and from Plaintiffs' monies which the Plaintiffs had entrusted to them, wrongfully caused five wire transfers totaling $1,600,000.00 be made to Vitalis (collectively "the Vitalis Transfers") as follows:

    a. $1,000,000.00 on June 2, 2008 from COP's American National Bank account;

    b. $200,000.00 on September 30, 2008 from COP's American National Bank account;

    c. $200,000.00 on October 6, 2008 from COP's American National Bank account;

    d. $100,000.00 on October 15, 2008 from MEI's American National Bank account (but in the books and records produced by the Harmon Defendants, this payment was entered as being paid by COP); and,

    e. $100,000.000 on or about October 21, 2008 from COP's American National Bank account.

42. Upon information and belief, immediately before and/or contemporaneous with each of the Vitalis Transfers, LH and Castillo:

    a. discussed with each other, and/or otherwise communicated with each other, that each of the Vitalis Transfers was going to be made to Vitalis; and,

    b. agreed with each other that each of the Vitalis Transfers was going be made to Vitalis.

43. Immediately before and/or contemporaneously with the June 2, 2008, October 6,

2008, and October 15, 2008 transfers, LH signed and transmitted written instructions to American National Bank directing it to make these transfers.

44. Immediately before and/or contemporaneously with the September 20, 2008 and October 21, 2008 transfers, Castillo signed and transmitted written instructions to American National Bank directing it to make these transfers.

45. Upon information and belief, immediately after each of the Vitalis Transfers, LH and Castillo, discussed with each other, and/or otherwise communicated with each other, that each of the Vitalis Transfers had been made.

46. Upon information and belief, Vitalis, LH Corp, and Harmon LLP ratified each of the Vitalis Transfers.

47. No person at any time ever obtained Plaintiffs' permission to make the Vitalis Transfers.

48. Plaintiffs never agreed to become a member of Vitalis or to loan money to Vitalis.

49. The Harmon Defendants never discussed the Vitalis Transfers with Plaintiffs at any time.

50. When the Vitalis Transfers were made, Plaintiffs were not indebted to the Harmon Defendants, Vitalis, or any other relevant person relating to the Vitalis Transfers.

51. Plaintiffs have never received any consideration for any of the Vitalis Transfers.

52. The Vitalis Transfers were made for the benefit of the Harmon Defendants and Vitalis, and to the detriment of Plaintiffs, and in violation of the Harmon Defendants' fiduciary and other duties owed to Plaintiffs.

53. At all relevant times, the Harmon Defendants knew that the Vitalis Transfers were wrongful and were made without Plaintiffs' permission.

**D.    The Harmon Defendants Failed To Properly Communicate Any Investment Recommendations and/or Strategy to Plaintiffs re: Vitalis.**

54. The Harmon Defendants' services in causing the Vitalis Transfers to be made constitute "personal financial planning" public accountancy services to the Plaintiffs pursuant to the AICPA's Statements On Responsibilities In Personal Financial Planning Practice, Sections

**9**
FIRST AMENDED COMPLAINT

100.01-03 and .05.

55. AICPA's Statements On Responsibilities In Personal Financial Planning Practice, Section 100.17, which is applicable to the Vitalis Transfers, provide that a licensee:

> "should communicate recommendations to clients in a manner that assists the client in evaluating strategies and implementing financial planning decisions. **Such communications should ordinarily be in writing** and include a summary of the client's goals and significant assumptions, a description of any limitations on the work performed, the recommendations made, and a statement that projected results may not be achieved."

56. In the alternative, as Plaintiffs' fiduciaries, the Harmon Defendants owed Plaintiffs a duty to clearly articulate and communicate any recommendation and investment strategy to Plaintiffs regarding the Vitalis Transfers and any other investment.

57. In derogation of AICPA's Statements On Responsibilities In Personal Financial Planning Practice, Section 100.17, among other AICPA Standards and other law governing public accountancy services, the Harmon Defendants failed to communicate any recommendation and investment strategy (including a writing) to Plaintiffs regarding the Vitalis Transfers. In the alternative, assuming *arguendo* that the Harmon Defendants contend that an oral communication was made with respect to a recommendation to make the Vitalis Transfers, this communication was inarticulate, incomplete, unclear, vague, and defective.

58. In derogation of California law, other than that applicable to public accountancy services, the Harmon Defendants failed to communicate any recommendation and investment strategy (including a writing) to Plaintiffs regarding the Vitalis Transfers. In the alternative, assuming *arguendo* that the Harmon Defendants contend that an oral communication was made with respect to a recommendation to make the Vitalis Transfers, this communication was inarticulate, incomplete, unclear, vague, and defective.

**E.     The Harmon Defendants Engaged In Wrongful Self-Dealing.**

59. The Harmon Defendants' having a membership interest in Vitalis created a conflict of interest between Plaintiffs and them with respect to any involvement in Vitalis by Plaintiffs.

60. The Harmon Defendants' conduct in causing the Vitalis Transfers to be made constitute "personal financial planning" public accountancy services to the Plaintiffs pursuant to

**10**
FIRST AMENDED COMPLAINT

the AICPA's Statements On Responsibilities In Personal Financial Planning Practice, Sections 100.01-03 and .05.

61. Pursuant to 16 CCR Section 57, "a Licensee shall not concurrently engage in the practice of public accountancy and in any other business or occupation which impairs the licensee's independence, objectivity, or creates a conflict of interest in rendering professional services."

62. In the alternative, pursuant to general California law, a fiduciary breaches the duty owed to its principal by self-dealing and placing its own interests above that of its principal.

63. Upon information and belief, at all relevant times, Vitalis was in poor financial condition such that it was it was reckless for the Vitalis Transfers to be made.

64. The infusion of the Vitalis Transfers into Vitalis benefitted Vitalis and the Harmon Defendants, and harmed Plaintiffs.

66. The Harmon Defendants engaged in wrongful self-dealing in causing the Vitalis Transfers to be made in derogation of 16 CCR Section 57, among other law relating to public accountancy services..

67. The Harmon Defendants engaged in wrongful self-dealing in causing the Vitalis Transfers to be made in derogation of California law.

**F.     The Harmon Defendants Attempted to Hide the Vitalis Transfers From Plaintiffs.**

68. At all relevant times, all financial statements issued by the Harmon Defendants were required to conform to professional standards pursuant to B & P Code Section 5062 and 16 CCR Sections 58 and 68.

69.  In the alternative, as Plaintiffs' fiduciaries, the Harmon Defendants were required to properly disclose the Vitalis Transfers to Plaintiffs.

70. After the Vitalis Transfers were made, in 2008, the Harmon Defendants failed to adequately disclose them to the Plaintiffs, by, among other things, forwarding deftly, but deceptively written and incomplete financial materials to Plaintiffs and/or to several other persons, which only upon close review and to the trained eye, evidence the Vitalis Transfers.

71. The persons to whom the 2008 financial materials were sent were not responsible for

reviewing them.

72. At all relevant times, the Harmon Defendants knew that the persons to whom the 2008 financial materials were sent were not responsible for reviewing them.

73. At all relevant times, the Harmon Defendants knew that Plaintiffs exclusively relied upon the Harmon Defendants to handle all of Plaintiffs' financial matters.

74. The Vitalis Transfers, which total $1,600,000.00, constitute important financial matters which, among other things, should have been clearly and conspicuously disclosed to Plaintiffs by the Harmon Defendants including but not limited to the Harmon Defendants sending Plaintiffs clear and conspicuous writings:

    a. confirming that the Vitalis Transfers were going to be made as a result of Plaintiffs giving their permission (which was never given); and,

    b. memorializing that each of the Vitalis Transfers was made.

75. The Harmon Defendants never sent Plaintiffs clear and conspicuous writings as alleged in the preceding paragraph in furtherance of the Harmon Defendants attempt to hide the Vitalis Transfers from Plaintiffs.

76. The Harmon Defendants attempting to hide the Vitalis Transfers from Plaintiffs is a breach of the duties and standards of care of B & P Code Section 5037(b) and 15 CCR Sections 58 and 68.

77. In the alternative, the Harmon Defendants attempting to hide the Vitalis Transfers from Plaintiffs is a breach of the standard of care owed by a provider of services, including a fiduciary under general California law.

**G.     The Harmon Defendants Created False and Duplicitous Records.**

78. A Vitalis General Ledger dated November 20, 2008 prepared by the Harmon Defendants on an unknown date states that COP made "loans" to Vitalis subject to promissory notes.

79. The Harmon Defendants have never transmitted a promissory note, deed of trust and/or other security interest relating to any alleged loan at any time to Plaintiffs in connection with the Vitalis Transfers.

**12**
FIRST AMENDED COMPLAINT

80. In or about early 2009, the Harmon Defendants prepared and sent Plaintiffs a Schedule K-1 with respect to the Vitalis Transfers. The K-1 denotes that COP has a membership interest in Vitalis with a capital contribution of $1,600,000.00.

81. A Schedule K-1 denoting an membership interest in a limited liability company is inconsistent with a lender-borrower relationship.

82. The Harmon Defendants preparing two irreconcilable versions of the Vitalis Transfers in which the Harmon Defendants have a conflict of interest with Plaintiffs violate the standard of care governing CPAs pursuant to, among other things, B & P Code Section 5062, 16 CCR Sections 57-58, and various AICPA Standards.

## FIRST CLAIM FOR RELIEF

### (Breach of Fiduciary Duty Against The Harmon Defendants)

83. Plaintiffs repeat and reallege paragraphs 1 through 82, inclusive, and incorporate them herein by this reference.

84. As Plaintiffs' business managers, accountants, business advisors, CPAs, and trustees, who rendered services to Plaintiffs from 2003 through 2008, the Harmon Defendants owed Plaintiffs various fiduciary duties, as pled above.

85. The Harmon Defendants breached their fiduciary duties to Plaintiffs by engaging in the above pled wrongful conduct.

86. The Harmon Defendants' wrongful conduct constitutes malfeasance. At all relevant times, the Harmon Defendants knew that their conduct was wrongful or in the alternative, they behaved recklessly.

87. As a proximate result of the Harmon Defendants' wrongful conduct, Plaintiffs have been damaged in a sum according to proof at time of trial, but in no event less than $1,600,000.00.

88. In doing the acts herein alleged, the Harmon Defendants and each of them acted with oppression, fraud, and malice. Their conduct shocks the conscience. Plaintiffs are entitled to punitive damages in an amount subject to proof from each of them.

///

## SECOND CLAIM FOR RELIEF

### (Negligence Against The Harmon Defendants)

89.  Plaintiffs repeat and reallege paragraphs 1 through 82, inclusive, and incorporate them herein by this reference.

90. As Plaintiffs' business managers, accountants, business advisors, CPAs, and trustees, who rendered services to Plaintiffs from 2003 through 2008, the Harmon Defendants owed Plaintiffs various duties, as pled above.

91. The Harmon Defendants breached their duties to Plaintiffs by engaging in the above pled wrongful conduct which breached the standards of care owing to Plaintiffs.

92. As a proximate result of the Harmon Defendants' wrongful conduct, Plaintiffs have been damaged in a sum according to proof at time of trial, but in no event less than $1,600,000.00.

## THIRD CLAIM FOR RELIEF

### (Negligence *Per Se* Against The Harmon Defendants)

93.  Plaintiffs repeat and reallege paragraphs 1 through 82, inclusive, and incorporate them herein by this reference.

94. As Plaintiffs' business managers, accountants, business advisors, CPAs, and trustees, who rendered services to Plaintiffs from 2003 through 2008, the Harmon Defendants owed Plaintiffs various statutory duties, as pled above.

95. The Harmon Defendants breached their statutory duties owed to Plaintiffs by engaging in the above pled wrongful conduct, which breached the standards of care owing to Plaintiffs, and which constitutes negligence *per se*.

96. As a proximate result of the Harmon Defendants' wrongful conduct, Plaintiffs have been damaged in a sum according to proof at time of trial, but in no event less than $1,600,000.00.

## FOURTH CLAIM FOR RELIEF

### (Conversion Against All Defendants)

97. Plaintiffs repeat and reallege paragraphs 1 through 82, inclusive, and incorporate

them herein by this reference.

98. By making and/or receiving the Vitalis Transfers, defendants wrongfully converted Plaintiffs' property to their own use and/or for Vitalis' use from which defendants benefitted.

99. As a proximate result of defendants' wrongful conduct, Plaintiffs have been damaged in a sum according to proof at time of trial, but in no event less than $1,600,000.00.

100. In doing the acts herein alleged, defendants acted with oppression, fraud, and malice. Defendants' conduct shocks the conscience. Plaintiffs are entitled to punitive damages in an amount subject to proof from each defendant.

## FIFTH CLAIM FOR RELIEF

### (For An Accounting Against All Defendants)

101. Plaintiffs repeat and reallege paragraphs 1 through 82, inclusive, and incorporate them herein by this reference.

102. At all relevant times, the Harmon Defendants were Plaintiffs fiduciaries, CPAs, business managers, and trustees, and as such, are required to furnish Plaintiffs with Plaintiffs' complete, true and correct books and records relating to all of Plaintiffs' financial affairs, including all documents relating to Vitalis, PP, and MCG.

103. At all relevant times, the Harmon Defendants were members of Vitalis.

104. In or about 2009, the Harmon Defendants prepared a K1, which contends that COP is a Vitalis member. Assuming that COP is a Vitalis member, the Harmon Defendants, as fellow Vitalis members, owe COP a fiduciary duty, which includes furnishing COP with all of Vitalis's complete, true, and correct books and records.

105. At all relevant times, the Harmon defendants were members of PP.

106. In or about 2009, the Harmon Defendants prepared a K1, which contends that COP is a PP member. Assuming that COP is a PP member, the Harmon Defendants, as fellow PP members, owe COP a fiduciary duty, which includes furnishing COP with all of PP's complete, true, and correct books and records.

107. Despite demand, the Harmon Defendants have refused and continue to refuse to provide Plaintiffs with their complete, true and correct books and records, including a complete

and proper accounting of the Vitalis Transfers and other transfers of Plaintiffs' monies, including those relating to PP, all of which were demanded in the February 23, 2009 letter from Plaintiffs' counsel to the Harmon Defendants.

108. An accounting is needed to ascertain Plaintiffs' rights in Vitalis, PP, and monies which the Harmon Defendants have caused to be transferred to Vitalis, PP and MCG.

## SIXTH CLAIM FOR RELIEF

**(B & P Code Section 17200, et. seq. Against All Defendants)**

100. Plaintiffs repeat and reallege paragraphs 1 through 82, inclusive, and incorporate them herein by this reference.

110. The above described conduct by defendants constitutes deceptive, unfair, and unlawful business practices within the meaning of Business and Professions Code Section 17200, *et. seq.*

111. Pursuant to Business and Professions Code Section 17203, an order should issue requiring defendants to disgorge all of Plaintiffs' monies which they received from any person belonging to Plaintiffs arising out of the Vitalis Transfers, and to disgorge all profits earned through the use of the Vitalis Transfers.

## SEVENTH CLAIM FOR RELIEF

**(Restitution/Unjust Enrichment Against All Defendants)**

112. Plaintiffs repeat and reallege paragraphs 1 through 82, inclusive, and incorporate them herein by this reference.

113. There was never an enforceable contract between Plaintiffs on the one hand, and Vitalis and the Harmon Defendants on the other relating to the Vitalis Transfers.

114. The Vitalis Transfers conferred a benefit on Vitalis and the Harmon Defendants.

115. Upon information and belief, the benefits conferred on the Harmon Defendants, who at all relevant times, were Vitalis members, included:

    a. elimination and/or reduction of required capital contributions to Vitalis; and,

    b. paying Vitalis's creditors, to whom the Harmon Defendants are personally responsible to, in whole or in part.

116. Vitalis and the Harmon Defendants knowingly accepted the benefits of the Vitalis Transfers.

117. It would be inequitable for Vitalis and the Harmon Defendants to retain the benefits of the Vitalis Transfers.

118. An order should issue requiring Vitalis and the Harmon Defendants to provide restitution, reimbursement, indemnification, and reparation to Plaintiffs for the amounts of the Vitalis Transfers, i.e. $1,600,000.00, including interest thereon.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

1. For compensatory damages in the sum of $1,600,000.00;

2. For punitive damages subject to proof;

3. For disgorgement of all monies received arising out of the Vitalis Transfers, and all profits thereon;

4. For an order requiring Vitalis and the Harmon Defendants to provide restitution, reimbursement, indemnification, and reparation to Plaintiffs for the amounts of the Vitalis Transfers, i.e. $1,600,000.00, and all profits thereon;

5. For imposition of a constructive trust in which defendants hold for Plaintiffs' benefit all of the wrongfully transferred monies and all profits thereon;

6. For imposition of a resulting trust in which defendants hold for Plaintiffs' benefit all of the wrongfully transferred monies and all profits thereon;

7. For interest thereon at the maximum legal rate;

///
///
///
///
///
///
///

1  8. For an accounting;

2  9. For costs; and,

3  10. For such other relief that the Court deems just and proper.

Dated: January 8, 2010

ROBERT W. HIRSH & ASSOCIATES
ROBERT W. HIRSH

WEINTRAUB, GENSHLEA CHEDIAK
CHARLES L. POST

    /s/ - Robert W. Hirsh
By:   Robert W. Hirsh

Attorneys for Plaintiffs Carmelo Anthony, Melo Enterprises, Inc., and Chosen One Properties, LLC

**DEMAND FOR JURY TRIAL**

Plaintiffs Carmelo Anthony, Melo Enterprises, Inc., and Chosen One Properties, LLC hereby request a trial by jury provided by the Federal Rules of Civil Procedure.

Dated: January 8, 2010

ROBERT W. HIRSH & ASSOCIATES
ROBERT W. HIRSH

WEINTRAUB, GENSHLEA CHEDIAK
CHARLES L. POST

　　　/s/ - Robert W. Hirsh　　　
By:　Robert W. Hirsh

Attorneys for Plaintiffs Carmelo Anthony, Melo Enterprises, Inc., and Chosen One Properties, LLC